# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00753-CV

In the Interest of M. A. S. and K. L. S.

FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
NO. A-03-0319-CPS, HONORABLE RAE LEIFESTE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Linda Brandt appeals from an order appointing managing conservators for her nephews, M.A.S. and K.L.S., following the death of their father. The order appointed Brandt, the boys' paternal aunt, and Cathy Shields, the boys' mother, joint managing conservators. The order also named Shields the primary caretaker of K.L.S. and Brandt the primary caretaker of M.A.S. On appeal, Brandt contests the part of the order pertaining to K.L.S. She challenges the district court's findings that removing K.L.S. from his mother's primary care would cause a significant emotional impact on him and that having Shields as his primary caretaker is in his best interest. We affirm the order of the district court.

During their marriage, Shields and Robert Eldon Shields, Jr. had three boys who were born in 1985, 1990, and 1995. When the couple divorced in 2000, Robert Shields was appointed sole managing conservator. Shields was given the right only to supervised visitation with the boys,

due at least in part to her dependence on alcohol and drugs and her behavior associated with this dependence.

In May 2003, Robert Shields died in an automobile accident that severely injured K.L.S. and also injured his brothers. K.L.S.'s injuries included severe injuries to his right femur and to his head. He was in pediatric intensive care for a month, then in rehabilitation within the hospital for two months.

In October 2003, the Texas Department of Protective and Regulatory Services was appointed temporary managing conservator of K.L.S.[1] Shields, along with Brandt and the boys' maternal grandmother, was appointed temporary possessory conservator; however, Shields was awarded possession of K.L.S. When awarding Shields possession of K.L.S., the court stated that the placement was designed primarily to maintain the environment that seemed to be assisting K.L.S.'s therapy and recovery. K.L.S. continued to receive physical, occupational, and emotional therapy. There was great concern that a fall that would not ordinarily harm a child could seriously injure K.L.S. because of the existing injuries to his leg and his brain. For several weeks, K.L.S. was required to wear a gait belt—a device that allowed adults to grab him to help prevent him from falling. During this time, K.L.S. was not to be more than an arm's length away from someone who could stop him from falling. K.L.S. progressed so that, by December 2003, he no longer needed the gait belt or such close supervision.

---

[1] A separate cause concerning custody of M.A.S. was later consolidated into this cause. The oldest brother reached majority before the outset of this cause and is not a subject of this suit.

Following hearings in December 2003 and March 2004, the district court rendered the final order appointing Brandt and Shields joint managing conservators of the two minor boys in August 2004. In this order, the court appointed Shields the primary caretaker of K.L.S. and Brandt the primary caretaker of M.A.S. Upon request, the district court issued findings of fact and conclusions of law. These included a finding that, despite Shields's significant history of abandonment and substance abuse, K.L.S. had developed an emotional bond with her during his hospitalization that aided his recovery from his injuries. The district court also found that Shields demonstrated many months of sobriety and consistent care of K.L.S.—a development that the court concluded had a "guarded chance" of continuing—and that removal from Shields's primary care would have a significant impact on K.L.S.

Brandt argues that the district court's decision to make Shields K.L.S.'s primary caretaker is based on findings that are not supported by the evidence. Brandt contends that the record does not contain sufficient evidence demonstrating that keeping Shields as K.L.S.'s primary caretaker was in K.L.S.'s best interest because removing him from her care would have a significant emotional impact on him.

The custody order at issue is a modification of the original custody order rendered at the time of the divorce decree. The family code permits modification of an order appointing a conservator of the child under certain conditions, including the following:

if modification would be in the best interest of the child and:

(1)  the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:

3

(A) the date of the rendition of the order; or

(B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based;

Tex. Fam. Code Ann. § 156.101 (West Supp. 2005). There is no dispute that K.L.S.'s circumstances have changed materially and substantially since the original custody decree. His sole managing conservator has died and he has suffered serious injuries. The issue is whether the record supports the conclusion that modifying the order to make Shields the primary caretaker of K.L.S. is in K.L.S.'s best interest.

A trial court's order modifying a conservatorship will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). We conduct a two-pronged inquiry: (1) whether the trial court had sufficient information on which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *Echols*, 85 S.W.3d at 477-78.

The traditional sufficiency review comes into play with regard to the first question. *Id*. at 478. Brandt does not specify whether her challenge to the sufficiency of the evidence is based on legal or factual sufficiency. In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to fact determinations of the finder of fact, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of

4

evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In reviewing a factual insufficiency point, we consider, weigh, and examine all the evidence presented at trial. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

If there is sufficient evidence upon which the trial court could have exercised discretion, we then must decide whether the trial court properly exercised that discretion. *See Echols*, 85 S.W.3d at 478. The test for abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner, or whether it acted without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Echols*, 85 S.W.3d at 477 (citing *Valdez v. Valdez*, 930 S.W.2d 725, 731 (Tex. App.—Houston [1st Dist.] 1996, no writ)). The question of conservatorship of a child is left to the sound discretion of the trial court when it sits as the trier of fact because the trial court is in the best position to evaluate the intangible features of the evidence that cannot be discerned by merely reading the record. *Id.*

There is sufficient evidence that removing K.L.S. from his mother's care would have a significant emotional impact on K.L.S. Several witnesses testified regarding the potential trauma

5

from breaking the strong emotional bond that had developed between mother and son, including Dr. Douglas Horner, the pediatrician who treated K.L.S. in the hospital; Kathy Horner, the doctor's wife, who kept K.L.S. while Shields took required counseling; Child Protective Services specialist Anthony Rastetter; and CPS family reunification caseworker Myra McClarhety. Nurse's aide Gracie Masquera testified that Shields performed almost all the nurse's aide duties like changing K.L.S.'s diaper and stayed with him daily, including when he was in a coma. Even guardian ad litem Elizabeth Jenkins, who recommended that Brandt be given possession of K.L.S., acknowledged that K.L.S. might suffer trauma if taken from his mother. Brandt conceded that the separation would be difficult, but she contended it could be overcome with planning. Some witnesses doubted that Shields's sobriety and responsible care for K.L.S. would continue. They also opined that K.L.S. could overcome the emotional upset from separation and expressed concern about the emotional toll of keeping him separate from his brothers. This evidence does not undermine the finding that taking K.L.S. from his mother's care would have a significant emotional impact on him. The district court's finding on this point was supported by legally and factually sufficient evidence.

The more disputed issue is whether the placement with his mother is in K.L.S.'s best interest. Factors used to evaluate the best interests of a child include: (1) the emotional and physical needs of the child now and in the future; (2) any emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the programs available to assist those individuals to promote the best interest of the child; (5) the plans for the child by those individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship

6

is not a proper one; and (8) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Although this test is often used in termination of parental rights cases, the factors are relevant to custody decisions.

Dr. Horner testified that he believed removing K.L.S. from Shields would harm K.L.S. Horner treated K.L.S. while he was hospitalized from his admission in a coma until his release. Since K.L.S. was released from the hospital, Horner has seen him weekly at church. Horner testified that other doctors keep him updated on K.L.S.'s condition because they know he has taken a personal interest. While acknowledging Shields's history of abusing drugs and alcohol, he declared that he has seen only positive interactions between mother and son. He testified:

> I am convinced that the role his mother played in his recovery has been huge, and I am also convinced, from the way [K.L.S.] feels about his mother and the way he talks about her and interacts with me about her, that if he were removed from her care that would be devastating to him as far as the speed with which his ongoing recovery would continue.

Horner testified that, although Brandt and M.A.S. love K.L.S., the trauma of separation from his mother would prevent them from taking equally good care of him because they could not replicate the unique bond that had developed between mother and son during his hospitalization and treatment. He was of the opinion that, while doctors in other cities could care for K.L.S., they could not replicate the months of experience from watching K.L.S.'s recovery. Horner also testified that he and the treating doctors would be able to tell if Shields reverted to substance abuse and would immediately report such to the appropriate authority, although he admitted he would not be able to tell immediately without constantly supervising K.L.S. and his mother.

7

Other witnesses testified similarly. CPS specialist Rastetter said that the strength of the bond between mother and son was the primary basis for his recommendation that Shields keep K.L.S. with her. She followed the Department's plan for her, attending counseling and meetings and passing drug tests. He noted two reports of instances in which Shields did not constantly have K.L.S. within arms length to help avert a fall. He also testified that Brandt would be an appropriate placement. Kathy Horner, who saw K.L.S. both at church and while babysitting him during his mother's counseling sessions, testified that K.L.S. was doing well under Shields's care.

Shields testified that she had worked toward getting her equivalency diploma. With help largely from the hospital and church communities, she had created a warm, safe environment in her apartment for K.L.S. She intended to move to San Angelo rather than return to Kansas. She would keep in contact with K.L.S.'s brothers and family and would encourage as much visitation as was possible given Brandt's intention to return with M.A.S. to her Missouri home. She had worked as a waitress previously and as a trash hauler until she broke her hip. She testified that she intended to return to work when K.L.S.'s needs permitted her time. At the time of the hearing, she was entirely reliant on survivors' benefits and other forms of official and informal financial assistance.

There was also countervailing evidence. Guardian ad litem Jenkins expressed fear that Shields would relapse into her previous behavior of abusing drugs and alcohol and neglecting the child. She recited a history showing twenty-seven incidents reported to CPS about neglect and endangerment through commission of crimes. Although there was some uncertainty regarding whether multiple reports might relate to the same incident, there was evidence of at least four arrests for driving while intoxicated, including two since the divorce in 2000. Jenkins testified that,

8

although separating from his mother would be "very difficult" for K.L.S., reuniting with his brothers would ease that difficulty. Lela Shields, the child's paternal grandmother, testified that Shields had a history of trying to stay sober, but failing to do so. Even Rastetter expressed concern that Shields could relapse. Shields was evasive in her testimony regarding the specifics of her past misdeeds, acknowledging some and failing to recall others, even some incidents that involved arrest. Although Shields repeatedly insisted that her bad choices were in the past, court-appointed special advocates case manager Joann Selman expressed concern that Shields's attitude toward the past showed a failure to take responsibility that might presage a relapse. Witnesses expressed concern that the physical, emotional, and financial challenges of raising a child in K.L.S.'s condition might eventually overwhelm Shields, particularly as he aged into his teens. There was also evidence that, when K.L.S. was injured, Shields was dating a sex offender who visited the boys in the hospital. There is no indication regarding the nature of the man's offenses, however, and there is also no evidence that he had any contact with the boys after the court issued temporary orders banning him from contacting them.

There was ample evidence that Brandt would provide a good home for K.L.S. in Missouri. Brandt and her husband have room in their home and resources to support K.L.S. They had cared for M.A.S. and his older brother as well. Brandt had taken a leave of absence from her job for the ten months between the accident and the trial. The boys' grandmother, who had lived with them and their father since shortly after the divorce, lived an hour away. Brandt and her husband had experience raising a special needs child—her son, who died at age 21 of cystic fibrosis. She and her husband had found services available to help K.L.S. in their hometown. While she

9

acknowledged that separating K.L.S. from his mother could cause trauma, she believed that the transition could be handled in such a way as to soften the blow. She testified that she did not see any benefit to K.L.S. staying with his mother.

Although there is evidence that Brandt could provide a stable, loving environment for K.L.S., there is also evidence that Shields is prepared to do the same. When reviewing a record containing this type of sufficient—but conflicting—evidence, we must accord great deference to the trial court's decision because it observed the witnesses and was able to assess intangibles not apparent in the written record. *See Echols*, 85 S.W.3d at 477. Concerns that Shields's reformation could be temporary are offset by concerns that separating K.L.S. from his mother would be damaging and could impair his recovery. Dr. Horner's testimony in this regard is unequivocal and uncontradicted. It is compelling evidence that Shields is and will be better able to meet K.L.S.'s emotional and physical needs.[2] The record before us in this matter supports the district court's determination that having Shields as his primary caretaker is in K.L.S.'s best interest. Under the standard of review applicable here, we will overturn the trial court's conservatorship determination only if it is arbitrary or unreasonable. *Id*. We cannot say, based on the evidence in this record, that naming Shields as K.L.S.'s primary caretaker was arbitrary or unreasonable.

---

[2] Brandt contends that Shields was not entitled to a statutory presumption that placement with a parent is in the child's best interest, *see* Tex. Fam. Code Ann. § 153.131(a) (West 2002), contending that the statutory presumption does not apply to proceedings to modify existing orders. *See In re V.L.K.*, 24 S.W.3d 338, 342-43 (Tex. 2000). Although the district court discussed the presumption at the end of the hearing, its order, findings, and conclusions are silent regarding whether it relied on the presumption. We need not address the merits of this argument because there is sufficient evidence supporting the court's decision independent of any presumption.

10

Finding that sufficient evidence supports the district court's findings that removing K.L.S. from his mother would have a significant emotional impact on him and that staying with his mother is in K.L.S.'s best interest, we affirm the district court's order naming Shields the primary caretaker of K.L.S.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   February 10, 2006